NEW YORK CENTRAL RAILROAD CO. *v.* THOMPSON.

[No. 27,247.  Filed June 27, 1939.  Rehearing denied
October 4, 1939.]

*T. A. McCormack, Cook & Walker, Forrest C. Chenoweth*, and *S. W. Baxter*, for appellant.

*John O. Spahr*, and *Omer S. Jackson*, for appellee.

ROLL, J.—This was an action by the appellee against appellant to recover damages for personal injuries alleged to have been sustained by appellee by reason of negligence of appellant under the doctrine of the last clear chance.

The complaint was in one paragraph to which appellant answered by general denial.

The jury returned a general verdict in favor of appellee and judgment was entered accordingly.

Appellant filed a motion for judgment on the answers to interrogatories notwithstanding the general verdict. Also a motion for a new trial. The overruling of these motions are the errors assigned on appeal.

We will discuss appellant's second assigned error first. The first reason assigned in its motion for a new trial is the insufficiency of the evidence to support the verdict, and the second is that the verdict is contrary to law. From appellant's brief it is apparent that it relies mainly upon these two questions for a reversal of this case.

In considering the question as to the sufficiency of the evidence to support a verdict on appeal, this court will

consider only the evidence most favorable to the
█ appellee. *Hudelson et al.* v. *Hudelson et al.*
(1905), 164 Ind. 694, 74 N. E. 504; *Ray* v. *Baker*
(1905), 165 Ind. 74, 74 N. E. 619; *Hoskinson* v. *Cavender* (1895), 143 Ind. 1, 42 N. E. 358.

The record shows in substance, the following facts:
That on December 15, 1933, appellant operated a railroad through the town of Winchester, Indiana, over a double track, running east and west through said city of Winchester. The north track was known as the eastbound track. On the night of December 15, 1933, appellee, a woman, twenty-eight years old, was going from her sister's home, located on Oak Street, a little over a block north of appellant's tracks, and near the east edge of the city of Winchester, to the office of the General Glass Factory. The General Glass Factory is located south and just across appellant's tracks from where appellee was living on Oak Street. Appellee left her sister's home about 11:30 P. M. on the 15th of December, 1933, and proceeded south on Oak Street to appellant's tracks. She stepped over the north rail of the westbound track and her foot slipped and became fastened under the rail in such a manner that she could not extricate herself from her position. As appellee stepped across the first railing she saw one of appellant's trains approaching her from the east. The headlight was burning brightly and threw its rays of light some fifteen hundred to two thousand feet down the track in front of the engine. It was shown that the headlight was such that persons riding in the engine cab were able to see a rabbit cross the track fifteen hundred feet in front of the engine. The train appellee saw approaching was a freight train composed of some seventy-five cars and was about three-fourths of a mile east of her. When appellee's foot became fastened under the rail and she discovered that she was unable to get it

loose, she raised herself upon one knee, took her handkerchief and began waving it to signal the engineer to stop. Soon after appellant's train crossed the improved highway some three thousand four hundred feet east of where appellee was, the engineer began to sound short blasts of the whistle and continued to so sound the whistle until after it passed the point where appellee was injured. It appears from the evidence that as the train approached, appellee attempted to unfasten her shoe and made constant effort to extricate herself from her perilous position and at times would raise herself on one knee to signal the train to stop and all this time she was on appellant's tracks between the rails and within the rays of the headlight on the engine. Just before the engine reached appellee she flung herself over the south rail and freed herself, except her left arm, which was caught under the wheels of the engine and crushed and mangled to such an extent that it became necessary that it be amputated at the elbow.

The engineer in charge of appellant's train at the time of the injury, the fireman, the conductor, and the head brakeman, all were riding in the engine cab at the time of the injury, and all were looking down the track from the time the engine whistled for the crossing of the improved highway until they passed the point where the appellee contends she was injured; and all testified that they did not see appellee on the track, and in fact testified they saw no one on or near the track between the improved highway crossing above referred to and the depot where the train stopped.

There is a sharp conflict in the evidence as to the sounding of short blasts of the whistle between the improved highway crossing east of the glass factory and the point where appellee claims she was injured. Appellant's witnesses said no whistle was sounded except the regulation crossing whistle, which consisted of two

long and two short blasts; while`appellee, her brother, and her sister all testified to a series of short shrill blasts of the whistle. Appellee testified that after the engine had passed the improved highway crossing and about the time it reached the unimproved street crossing which was about eighteen hundred feet east of appellee, the whistle was sounded and continued to sound short, shrill blasts from that point until the train passed her. Appellee's brother and sister testified to hearing these short blasts, but did not know the occasion for them being sounded.

Interrogatories were submitted to the jury and in answer to interrogatories No. 24 and 25, the jury specifically found that the engineer in charge of appellant's train saw appellee on the westbound track and knew appellee's foot was fastened under the rail.

Taking the evidence most favorable to appellee, it is the position of appellant that the evidence is insufficient to sustain the verdict of the jury.

It is evident that the jury believed the evidence offered by appellee to the effect that her foot was fastened under the rail of appellant's track in such a manner that she was unable to extricate herself therefrom and they also believed her testimony as to the effort she made to free herself from her perilous position and to attract the attention of those in charge of the train. Also that appellant's engineer began to sound short blasts of the whistle after the engine had passed the improved highway crossing and when it was from fifteen to eighteen hundred feet east of appellee. Appellee contends that this evidence, although circumstantial in character, was sufficient to establish the fact that the engineer saw appellee at the time and place, and under the circumstances related by appellee. We think appellee is correct in this contention.

If we assume, as we must on appeal, that the jury believed appellee's witnesses as to the sounding of the short blasts of the whistle, then, in the absence of any explanation by appellant for the whistle, or any reason whatever given for such conduct, isn't it the most reasonable, logical, and natural thing for the jury to conclude that her presence there was the occasion for the blowing of the whistle? Under the evidence in this case, that was the only occasion for the sounding of the short blasts of the whistle were first sounded. So, the reasonable and sensible explanation of the whole story. We think, beyond any serious question, the evidence, although circumstantial, was quite sufficient to establish the fact of knowledge on the part of the engineer that appellee was on appellant's tracks. When it is determined that the evidence was sufficient to establish knowledge on the part of appellant's engineer of appellee's position upon the track of appellant, it becomes easy to approximate the distance the train was east of appellee at the time of the acquisition of such knowledge. Appellee testified that the engine was from fifteen hundred to eighteen hundred feet east of her when the short blasts of the whistle were first sounded. So, the engineer must have discovered appellee's presence upon the track before he began to sound the whistle. If he did see her, the evidence above set out, also justified the jury in finding that the engineer also knew that she was in a place of peril from which she was unable to extricate herself. All the witnesses testified as to the brightness of the headlight on the engine and the clearness with which objects were discernable that came within its rays. The jury was also justified in concluding that the engineer saw her floundering on the track, raising herself upon one knee, and waiving her handkerchief and must have known that she was in danger. It then became the duty of the engineer in

charge of appellant's train to use reasonable care and make use of the means available to stop the train or to slow its speed in order to avoid injury to appellee. The evidence also shows that if appellant had discharged this duty, appellee would not have been injured. The train was equipped with emergency brakes in addition to the regular brakes ordinarily used. The emergency brakes were not used. If they had been the speed of the train would have been considerably checked and the evidence was such that justified the jury in finding that it could have been completely stopped before it reached appellee.

Both appellant and appellee rely upon the case of *Terre Haute, etc., Traction Co.* v. *Stevenson* (1919), 189 Ind. 100, 123 N. E. 785. The doctrine of the last clear chance is discussed and many cases cited. The rules governing the last clear chance doctrine are very clearly put. In discussing the sufficiency of the evidence in that case the court said (p. 110) :

> "It is claimed that the motion for a new trial should have been sustained because of the insufficiency of the evidence, particularly in that there is no evidence to sustain the allegation that the motorman knew in time to stop or check the speed of the car that the occupants of the buggy did not know of its approach.
>
> "It is true that there is little positive or direct evidence relating to these allegations. The motorman admits that he saw the buggy traveling the parallel road when he was 800 to 900 feet from the crossing, and that he saw the horse turn into the curve to the private drive leading to the crossing. He testifies that the horse was trotting when he first saw it, and there was testimony that it continued to trot after turning until it reached the crossing. The evidence is undisputed that the distance from the traveled portion of the highway to the track, measured with the curve of the private driveway, is not more than sixty feet. The appellee testified that she knew nothing of the car until her horse was on the crossing.
>
> "The jury might reasonably infer that one allow-

ing the horse to trot the entire sixty feet on the drive that led only to the crossing did not know of the approach of the car, and might also reasonably have inferred that, as the motorman saw the vehicle approaching the track, and saw no act indicating that the horse's movement would be checked, he did know that the occupants of the buggy were probably unaware of the car's approach, and would enter upon the crossing. It is not necessary that the plaintiff prove that the motorman knew the state of her mind. It is only necessary that such facts and circumstances be shown as would cause a reasonably prudent person to apprehend or realize that she probably did not know of her peril and that the peril would continue.

"Proof of such facts and circumstances is permissible under the allegation that he knew that she did not know.

"Considering these undisputed facts, and all the other evidence and circumstances before the jury, we cannot say that the evidence was insufficient."

It seems to us that the case at bar is much stronger than the Stevenson case, *supra*, for the reason that if appellant's engineer saw appellee lying between the tracks when he was fifteen hundred feet away and saw her struggling, raising upon her knee and waving her handkerchief, he must have realized that appellee was in peril, for else why would he have continued to sound short blasts of the whistle all the way from the time he first saw her until the engine passed? At least we should say that the evidence was sufficient to justify the jury in finding that the engineer saw appellee when he was fifteen hundred feet east of her and that he knew of her peril. If then the engineer saw appellee before the injury and realized her perilous position, then it became his duty to avoid the injury if he could have reasonably done so.

It is said in the Stevenson case, *supra*, that (p. 105):

"The traveler's peril known to the motorman creates a special duty to take advantage of his chance, if he have a chance."

So in this case, when the engineer saw appellee and knew she was in a perilous situation, it became his duty to take advantage of his opportunity to stop the train or to avoid the injury if it could be done in the exercise of reasonable care.

The facts show that appellee did extricate herself from her perilous position just a few seconds before the engine reached her and if the engineer had checked the speed of the train slightly the injury might not have occurred. Be that as it may, the jury found by its answers to interrogatories that the train, as it approached appellee, was traveling from twenty to twenty-five miles per hour, and that at that rate of speed the train could have been stopped in a distance of from eight hundred to nine hundred feet; the jury also found that the engineer saw appellee when he was about fifteen hundred feet from her and had actual knowledge that appellee was unable to, extricate herself when he was eight hundred to a thousand feet east of appellee. By their general verdict they necessarily found that appellant's servants in charge of the train saw appellee on the track and knew of her perilous position in time to have avoided the injury by the exercise of reasonable care. While there is no direct testimony as to what distance appellant's train could have been stopped on the night in question going at twenty miles per hour, yet there is evidence that the train going forty-five miles per hour could have been stopped within its length, which was approximately twenty-seven hundred feet. The evidence shows that the train had not slackened its speed when it reached plaintiff, and all agree that it stopped about two car lengths east of the depot. The distances given by appellant's witnesses show that appellee was seventeen hundred feet east of the depot. So, if appellant's train was stopped within seventeen hundred feet by the application of the air brakes in the ordinary way, it is quite

certain that by the application of the emergency brakes it could have been stopped in much less distance, otherwise why have emergency brakes? The very purpose of emergency brakes is to bring the train to a stop quickly. So we do not think it unreasonable to say that the evidence was sufficient to support the verdict on the question as to whether or not appellant could have stopped the train or slowed down the speed in order to give appellee more time within which to extricate herself, and thus have avoided the injury. By not so doing, we think appellant guilty of negligence under the last clear chance doctrine, under the facts presented and that the evidence was sufficient to support the verdict and was not contrary to law.

The first proposition presented by appellant's brief is that the answers to the interrogatories are in irreconcilable conflict with the general verdict and therefore the trial court erred in overruling its motion for judgment notwithstanding the general verdict.

They say that the jury in its answer to interrogatory No. 30 found that the engineer had actual knowledge that appellee's foot was fastened under the rail and that she could not extricate herself therefrom when the train was eight hundred feet east of appellee and that by answer to interrogatory No. 32 they found that by the exercise of ordinary care with the means at hand, the train going at the rate of twenty miles per hour could be stopped in eight hundred to nine hundred feet and therefore these answers show conclusively that appellant could not have stopped the train in time to have avoided the injury, for the reasons that the train was eight hundred feet away when the engineer saw appellee and had knowledge that she could not get off the track and that he could not stop the train in less than eight hundred feet and therefore the injury to appellee was inevitable

under the special answers and in conflict with the general verdict.

The appellant is in error in this; the jury found that appellant's engineer saw appellee when he was fifteen hundred feet east of appellee, and the evidence might have been to the effect that it became his duty to apply the brakes at that time and also the evidence shows that if appellee had had a few more seconds of time she could have extricated herself in as much as she flung herself off the track just before the engine reached her but not in time to clear herself entirely as her arm was caught under the wheel of the engine. A checking of the speed would have afforded her the needed time and thus the injury would not have occurred. In considering the question of whether or not the answers to interrogatories are in irreconcilable conflict with the general verdict, only the pleadings, answers to interrogatories, and the general verdicts will be considered. *Bemis Indianapolis Bag Co.* v. *Krentler* (1907), 167 Ind. 653, 79 N. E. 974; *American Car and Foundry Co.* v. *Adams* (1912), 178 Ind. 607, 99 N. E. 993, and a general verdict will not be overthrown by answers to interrogatories if reconcilable therewith upon any supposable state of facts provable under the issues formed.

*Indianapolis Traction and Terminal Co.* v. *Kidd* (1906), 167 Ind. 402, 79 N. E. 347 and cases cited in Callaghan's Indiana Digest, trial §246, p. 388.

It was held in the case of *Princeton Coal, etc., Co.* v. *Roll* (1904), 162 Ind. 115, 66 N. E. 169, that the general verdict is conclusive unless there is a real and substantial conflict in some vital particular between it and the facts found, or some of them which cannot be avoided or explained by any reasonable intendment or inference and by which the general verdict is necessarily overthrown. This is the general rule followed by the many

decisions of this court and is not disputed by appellant.

We are not impressed with the seriousness of appellant's contention on this proposition. We can see no irreconcilable conflict between the special answers and the general verdict and we find no error in the court's ruling on appellant's motion for judgment, notwithstanding the general verdict.

Appellant complains about certain instructions given by the court and the refusal to give instructions Nos. 10 and 12 tendered by appellant. We have read all the instructions and are not impressed by appellant's objections thereto. By these instructions appellant requested the court to instruct the jury on the necessity of them finding the facts with reference to knowledge on the part of appellant's agents, that appellee was on the track and in a perilous position from which she could not extricate herself. The court, in several other instructions, very clearly and definitely told the jury that unless they found from the evidence that the agents of appellant in charge of the train had actual knowledge of appellee's perilous position and had such knowledge in time to have abated the speed of the train or stopped it by the exercise of reasonable care and thus avoid the injury, appellee would not be entitled to recovery.

It is made to appear from the answers to the special interrogatories that the jury fully understood these instructions for they specifically found that appellant's agents did have the knowledge mentioned in the instructions. So, it must be evident that appellant was not harmed by the refusal to give the tendered instructions. The jury was fairly and intelligently instructed in the law governing the questions in issue and we see no good reason for setting out the instructions in full or in discussing them more in detail. We find no reversible error in the instructions.

Appellant's Nos. 11, 12, 13, 14, 15, and 16th reasons

for a new trial relate to its motion to require the jury to make its answers to certain interrogatories more definite and certain. The jury, in their answers to interrogatories Nos. 15, 17, and 18, found that appellee arrived at the railroad track on the night of her injury between eleven-thirty and twelve o'clock P. M. and that appellant's train arrived at the town of Winchester and departed therefrom between eleven-thirty and twelve o'clock on said night. The indefinite answers to these interrogatories could not have influenced or necessarily changed the general verdict. Where the general verdict and other answers show upon their face that the indefinite answers given were not controlling or influential in the rendition of the general verdict, there would be no reversible error in overruling appellant's motion to require the jury to make their answers more definite and certain. It seems to us that the exact time appellee entered upon appellant's track, the exact time when appellant's train arrived at the town of Winchester, or the exact time it left Winchester is not at all controlling. In fact it seems that such answers must necessarily be approximated. No witness testified as to the exact time. The record of the time when the train arrived and when it departed was offered but no one said that the record was absolutely correct. The timepiece that indicated the time, from which the record was made, might have been wrong. No one could testify with exactness as to the time appellee was at any particular place or when she arrived or left any particular point. At best, such testimony was the expression of the judgment of the witness testifying. The answers given by the jury to interrogatories 15, 17, and 18 were approximately as definite as the evidence upon these matters. So, we can see no merit in appellant's reasoning and the court refuses to reverse the cause upon that ground. Interrogatory No. 19 asked the jury concerning the length of

appellant's train at the time it arrived at the city of Winchester. The jury answered, "Several cars back." It is obvious that either the jury did not understand the question or else the answer was intended for another interrogatory to which the answer would have been proper. It is quite clear, as appellant contends, that the answer is not responsive to the question. There was no dispute as to the approximate length of the train. Appellant's witnesses were the only persons who testified upon that subject and no one disputed them. So the answer, as given, could not have entered into the deliberation of the jury or the rendition of the general verdict. To reverse this cause and return the same for a new trial for so trivial and unimportant error as this would be unreasonable as well as unjust. Interrogatory No. 30 inquired as to what the distance was between the locomotive and the appellee at the time the engineer obtained knowledge that appellee was unable to extricate herself from her perilous position. The answer was, "eight hundred to a thousand feet." Interrogatory No. 32 asked the jury to state the distance the train could be stopped at the speed of from twenty to twenty-five miles per hour in the exercise of ordinary care with the means at hand. The answer was, "eight hundred to nine hundred feet."

Appellant contends that the jury should have answered this question by stating the exact distance in feet. Appellant contends in its brief that because the court refused to require such action of the jury that this cause should be reversed. It seems to us that such a contention borders on the ridiculous. Appellant's own engineer and brakeman could not and did not answer that question with any degree of exactness.

We have discussed all the questions presented by appellant's brief and find no reversible error.

Judgment affirmed.